**Larry Wallace MOFFETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 05–85–01128–CR, 05–85–01129–CR.**

Court of Appeals of Texas,
Dallas.

Aug. 25, 1986.

R.K. Weaver, Dallas, for appellant.

Anne B. Wetherholt, Dallas, for appellee.

Before WHITHAM, HOWELL and STEWART, JJ.

WHITHAM, Justice.

Appellant appeals a conviction for investing in the manufacturing of a controlled substance; i.e., amphetamine. Appellant also appeals a conviction for possession of cocaine. We find no merit in any of appellant's three grounds of error in the investing case. Consequently, we affirm the trial court's judgment of conviction for investing in the manufacture of amphetamine. We find no merit in either of appellant's two grounds of error in the possession of cocaine case. Accordingly, we affirm the trial court's judgment of conviction for possession of cocaine.

## THIS COURT'S JURISDICTION

■ We first address the State's cross-point contending that this court lacks jurisdiction over these appeals. Appellant was sentenced in each cause on August 30, 1985. Appellant filed a motion for new trial in each cause on September 9, 1985, which the trial court denied on the same date. Thereafter, appellant filed a notice of appeal in each cause on September 26, 1985. Accordingly, the State argues that appellant's notice of appeal was untimely. We disagree. TEX. CODE CRIM.PROC. ANN. art. 44.08(b) (Vernon Supp.1986) provides that notice of appeal must be filed within fifteen days after the overruling of the motion for new trial; thus, appellant's notice of appeal should have been filed on or before September 24, 1985. Appellant, however, points out that in his motion for new trial, he alternatively gave notice of appeal in the event the motion was overruled. Even assuming that appellant's notice of appeal contained in his motion for new trial was premature since it was filed before his motion for new trial was overruled, the prematurely filed notice was effective to confer jurisdiction on this court. *Panelli v. State,* 709 S.W.2d 655, 657 (Tex. Crim.App., 1985). Accordingly, we overrule the State's cross-point.

## THE INVESTING CASE

■ In his third ground of error, appellant contends that the evidence is insufficient to support the jury's verdict that he invested in the manufacture of amphetamine. The indictment in this cause charged that on or about May 7, 1984, appellant knowingly and intentionally "finance[d] and invest[ed] funds [appellant] knew and believed were intended to further the commission of an offense, to-wit: the manufacture of a controlled substance, namely: amphetamine in an amount ... of 200 grams or more." In reviewing the sufficiency of the evidence to support a conviction, this court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Lopez v. State,* 630 S.W.2d 936, 940 (Tex.Crim.App.1982). This standard applies whether the evidence presented at trial is direct or circumstantial. *Freeman v. State,* 654 S.W.2d 450, 456 (Tex.Crim. App.1983) (on rehearing). In applying this standard of review to circumstantial evidence cases, however, a process of elimination is used and the conviction cannot be upheld if the evidence supports an inference other than the guilt of the defendant. *Id.*

Henry Townsend testified that he rented a house to appellant and Wendy Daniel on April 15, 1984 (to March 1985). When he rented appellant the house, there were no chemicals in the house or garage, and no glass beakers or lab equipment. None of the items photographed in State's Exhibits Nos. 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17

(pictures of equipment and materials used in the manufacture of amphetamine described below) were there when he rented the house. After Townsend rented the house to appellant and Daniel, he noticed the garage door was closed all the time.

Phil Rust, an agent with the Drug Enforcement Administration, testified that he participated in an undercover operation known as Operation Dry Gulch. He operated the hidden video cameras that taped chemical purchases at Metroplex Chemical on Harry Hines. State's Exhibit No. 78 (Tape # 159) showed appellant at 11:52 a.m. on May 7, 1984, buying chemicals and laboratory equipment. The videotape was played for the jury. On the tape, appellant asked for PA (phenol acetic acid), AA (acetic anhydride) and SA (sodium acetate) costing $250. Appellant then said he had to replenish his wallet. The tape showed appellant buying condensers, a large flask and mantle and chemical items totaling $3910 when he returned. Appellant paid this amount in cash. Appellant had previously been videotaped on April 24, 1984, at about 3:49 p.m., as shown on State's Exhibit No. 79 (Tape # 156). On that videotape, appellant asked for hydrochloric gas, ether, and a vacuum pump, among other items, and he paid $335 cash. Appellant was also videotaped on May 24, 1984, at 10:40 a.m. on State's Exhibit No. 80 (Tape # 162). On that occasion, appellant bought sodium hydroxide, among other items, paying $1430 cash. Rust saw appellant between six and eight times at Metroplex Chemical and had other videotapes showing him there. On June 4, 1984, appellant spent $3200 for chemicals and glassware at Metroplex.

Harry Schmidt, a Drug Enforcement Administration agent, testified that he first met appellant when conducting this DEA "sting" operation code-named Operation Dry Gulch. The operation involved staffing and running undercover surveillance at Metroplex Chemical Company on Harry Hines in Dallas, a retail chemical store. A camera photographed persons who entered the store to buy chemicals. In June 1984, Schmidt contacted the Dallas Police Department to tell them where appellant lived and to gain their assistance in an investigation. A search warrant was procured for appellant's residence on June 29, 1984, and was executed. State's Exhibits Nos. 6 thru 17 were photographs taken of the residence during that search. Schmidt had been involved in the seizure of about 100 "speed labs" used to manufacture amphetamine or methamphetamine. In this search, Schmidt found a lab that was not functioning, but he surmised that it had recently functioned "from all the equipment that was there."

State's Exhibit No. 7 showed the lab site itself. Holes had been cut out of tables for large 50- to 72-inch flasks that are put on a heating element. There were controls to the heating element near to where the heating element and flask had been removed. State's Exhibit No. 8 was a close-up of the controls for the heating element. State's Exhibit No. 9 was a close-up of the wash basin where the equipment was cleaned (as Schmidt testified, "You have to clean it up right away.") When police arrived, the lab was broken down, washed, cleaned up and ready to transport. State's Exhibit No. 10 showed an area to the side where other heating elements were set for larger, 72-inch flasks to cook a large quantity of chemicals. State's Exhibit No. 11 showed vacuum tubes that are normally used in the cooking process, electrical cords, an automatic sterilizer which, when placed under the cooking element, makes it continually move and rotate by means of a magnet, and boiling beads to keep the mixture at a steady temperature to prevent boiling over. State's Exhibit No. 12 showed the inside of a cabinet shown in State's Exhibit No. 9. There were different sizes of silver heating elements to be used with different sizes of glassware. State's Exhibits Nos. 13 and 14 showed objects found in the cabinet alongside the glassware: chemical bottles, acetic anhydride, hydrochloric acid and formic acid (precursors[1] used in the manufacture of

1. Precursors are chemical components used to make drugs such as amphetamine or metham-

amphetamine), and boxes containing more gallon-size jugs—a large supply. State's Exhibit No. 15 showed a fan on the floor used to raise the fumes accumulated during the cooking process. A very large fan, three to four feet in diameter, was put into the ceiling to blow the fumes up through the roof. State's Exhibit No. 17 showed a closeup of a metal brace (where the flask and heating element are set together, there are metal arms that come up to hold the condensers, and these braces are tightened to hold it so it can continue to cook), a glass stopper to keep the water from evaporating, and boiler beads (glass particles that look like little beads placed in the liquid to stop it from overflowing or exploding). State's Exhibit No. 16 shows various parts of glassware used in the lab, a bottle of formic acid used as a precursor, and a condenser tube which fits on top of the flask. Inside a pictured 110 gallon, 55 kilo container, phenol acetic acid was found, one of the main precursors used to make P2P (phenol 2 proponol), which is a liquid one must make first in order to make amphetamine. The fumes found in these clandestine labs from chemicals such as P2P are nauseating and often fatal.

Schmidt testified that of the hundred or so labs whose seizure he had participated in, this was one of the larger ones in Dallas County. Based on the quantity of chemicals found and the sophistication of glassware, he estimated that this lab could produce 40 to 50 pounds of amphetamine per cook. Amphetamine, also known as "speed," is usually packaged in clear plastic bags and sold in grams, quarter-ounces, half-ounces, ounces, quarter-pounds, half-pounds and pounds. It looks like a white, crystal, fluffy powder. There are approximately 28.4 grams to an ounce. Amphetamine would cost $1000 to $1200 an ounce.

State's Exhibits Nos. 18 through 48 were evidence seized at appellant's residence on June 29, 1984. State's Exhibit No. 29 contains four gallon bottles of sodium acetate, which is used in the manufacture of amphetamine. State's Exhibit No. 34 con-

tained two bottles of formic acid and a bottle marked amphetamine ammonium chloride, both of which are used in the manufacture of amphetamine. State's Exhibit No. 30 contained four full bottles of ethyl alcohol. State's Exhibits Nos. 40, 44 and 45 contained formic acid. State's Exhibit No. 39 contained formamide (phonetic), a precursor for the manufacture of amphetamine. State's Exhibit No. 27 contained five bottles of hydrochloric acid, four full and one partially full. State's Exhibit No. 42 contained two bottles of sodium acetate, which is used in the manufacture of amphetamine; one bottle was nearly empty and the other was full. State's Exhibit No. 36 contained three full bottles of sodium acetate. State's Exhibit No. 37 contained three bottles of sodium acetate and one that was no longer filled with sodium, but was filled with PA (phenol acetone). These chemicals are used in the manufacture of amphetamine. State's Exhibit No. 38 contained three full gallon bottles of acetic anhydride. State's Exhibit No. 25 contained four full bottles of hydrochloric acid and one empty one. State's Exhibit No. 35 contained three full gallon bottles of formamide and one nearly a quarter full. Schmidt testified that he believed these were the chemicals he saw appellant purchase at Metroplex Chemical.

State's Exhibit No. 16 pictured a 110 pound drum, which contained about 80 pounds of phenol acetic acid at the time of the seizure. State's Exhibits Nos. 18 and 19 were heating elements with flasks inside, a smaller version of State's Exhibit No. 20 (a 72–inch heating element). State's Exhibit No. 26 was a large, 72–inch flask used to combine the chemicals to make the liquid amphetamine; it sits inside State's Exhibit No. 20. State's Exhibit No. 21 contained a similar device, a heating element and flask.

State's Exhibit No. 41 was a tan and red plastic box, marked as RCA parts on the front, that contained a large quantity of vials, tops and caps. There were twenty-

phetamine.

five to thirty-five vials. Such vials are commonly used to hold amphetamine or cocaine when it is sold in gram and quarter-ounce quantities. There were plastic bags in various sizes that are usually utilized for the sale of gram, quarter-ounce, half-ounce and ounce quantities. Some bags were labeled "three and a half grams," "half a quarter PC."

State's Exhibits Nos. 57 through 77 were seized items turned over to Drug Enforcement Administration chemist Charles Teer. Teer testified that he participated in the execution of the search warrant at appellant's residence to advise about safety problems with chemicals and to assist in collection of drug samples. He testified to how the chemical equipment operated. The chemical equipment and glassware seized from appellant's residence were consistent with what would be found in an amphetamine laboratory. The lab was not operating when the warrant was executed, but there were numerous pieces of evidence and the odor of phenol 2 proponol. From the equipment found, Teer could estimate the largest batch of amphetamine one could cook at one time using the largest flask would be 20 to 30 pounds, and the smaller flask could cook an additional 5 to 10 pounds, making a total of about 40 pounds unpurified and 20 to 25 pounds of final, pure product. This is in excess of 200 grams. Teer also chemically examined State's Exhibits Nos. 57 through 65. State's Exhibit No. 64 is phenol acetic acid, which is used to produce phenol 2 proponol, which, in turn, is used in the synthesis of amphetamine. State's Exhibits Nos. 59 and 65 were formamide, which is used with phenol 2 proponol to manufacture amphetamine. State's Exhibits Nos. 57, 61, 62 and 63 were phenol 2 proponol, the immediate precursor to amphetamine. State's Exhibit No. 58 was formic acid, which is used in the manufacture of amphetamine. State's Exhibit No. 60 is sodium acetate, which is used with phenol acetic acid and acetic anhydride in the manufacture of phenol 2 proponol, a precursor of amphetamine. The presence of phenol 2 proponol indicated to the chemist "the intent to make either amphetamine or methamphetamine." There were no chemicals other than those required to make amphetamine, and all the chemicals there were necessary to make or purify amphetamine.

Appellant and Wendy Daniel, his wife at the time of trial, were inside the house when the search warrant was executed. The inside of the house had the odor of either P2P or phenol acetic acid. The garage was attached to the house, and the officers determined that the smell was coming from there. State's Exhibit No. 70 was seized off the dresser in appellant's bedroom. State's Exhibits Nos. 69, 73 and 77 were seized inside a desk in the bedroom that served as an office. State's Exhibits Nos. 66, 67 and 68 (packages of white, crystal powder) were seized in the study area. State's Exhibit No. 71 (a package of white, crystal powder) was recovered from the nightstand in the front bedroom. State's Exhibit No. 72 was found in the house inside the box marked as State's Exhibit No. 41. Chemist Charles Teer testified that he had analyzed State's Exhibits Nos. 66, 67, 68, 69 and 77 and each contained cocaine (or a trace thereof). State's Exhibit No. 66 was 96% cocaine, a reasonably pure amount. State's Exhibit No. 67 was 100% pure cocaine. State's Exhibit No. 68 was 97% pure cocaine. State's Exhibit No. 69 was 99% pure cocaine. State's Exhibit No. 71 contained 98% pure amphetamine hydrochloride (which is quite pure). State's Exhibit No. 72 contained tablets of "oxicodone," (sic) known as "Pergadan," (sic) a controlled substance. State's Exhibit No. 70 was 80% pure amphetamine. State's Exhibit No. 73 was 79 grams (over 2½ ounces) of marijuana. The laboratory Teer saw was capable of producing an aggregate weight, including adulterants and dilutants, of over 200 grams of amphetamine. Also seized during the execution of the warrant at appellant's residence was a five gallon can of either from the garage. The ether was destroyed at the scene because ether is extremely volatile. Ether is also normally used to make amphetamine.

State's Exhibits Nos. 81 and 82, sheets of paper containing lengthy details on the processing and manufacturing of controlled substances, were also seized. State's Exhibit No. 81 contained handwritten sheets entitled "Preparation of Hash Oil and Hash." It also contained lists of chemicals and chemical equipment needed and their estimated cost. State's Exhibit No. 82 included papers entitled "Grignard Reaction for MMDA and MDA." MMDA is also known as "ecstasy". It included a list of laboratory equipment and instructions. It recited that the chemical equipment configuration is the same as "in the meth formula," and also contained a list describing necessary chemicals and equipment for synthesis of cocaine and for the manufacture of "anhyprous" ether.

Section 4.052 of the Controlled Substances Act, under which appellant was prosecuted, provides:

(a) A person commits an offense if the person knowingly or intentionally:

(1) expends funds he knows are derived from the commission of an offense under Section 4.03(c), 4.031(c), 4.032(c), 4.04(c), 4.041(c), 4.042(c), 4.043(c), 4.05(c), or 4.051(c) of this Act; or

(2) finances or invests funds he knows or believes are intended to further the commission of an offense listed in Subdivision (a)(1) of this subsection.

TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.052 (Vernon Supp.1986).

Each of the offenses listed in section 4.052(a)(1) is a described *aggravated offense* arising from the manufacture, delivery or possession of a controlled substance or delivery or possession of marijuana.

| Section | Aggravated |
|---|---|
| 4.03(c) (controlled substance) | manufacture or deliver (Penalty Group 1), 28 grams or more |
| 4.031(c) (controlled substance) | manufacture or deliver (Penalty Group 2), 28 grams or more |
| 4.032(c) (controlled substance) | manufacture or deliver (Penalty Group 3 or 4), 200 grams or more |
| 4.04(c) (controlled substance) | possession (Penalty Group 1), 28 grams or more |
| 4.041(c) (controlled substance) | possession (Penalty Group 2), 28 grams or more |
| 4.042(c) (controlled substance) | possession (Penalty Group 3), 200 grams or more |
| 4.043(c) (controlled substance) | possession (Penalty Group 4), 200 grams or more |
| 4.05(c) (marijuana) | delivery, more than 50 pounds |
| 4.051(c) (marijuana) | possession, more than 50 pounds |

A first reading of section 4.052 suggests that the statute focuses on the person "bankrolling" the commission of these aggravated offenses and, therefore, is inapplicable to a person manufacturing, delivering or possessing a controlled substance in an amount constituting one of these aggravated offenses or to a person delivering or possessing marijuana in an amount constituting one of these aggravated offenses. In the present case, appellant has not furnished money to another person to fund the manufacture, delivery or possession of a controlled substance or the delivery or possession of marijuana, (section 4.052(a)(2)), nor has appellant spent his share of funds received for "bankrolling" such an illicit undertaking (section 4.052(a)(1)). In short, appellant is not shown to be a person of means who funds, and then enjoys the fruits of, an aggravated offense involving a controlled substance or marijuana but who never gets his hands dirty touching contraband. At jury argument, both defense counsel and prosecutor recognized the issue. Defense counsel remarked that section 4.052 "talks about a third party, big bucks party that is behind the scene running, investing in, financing drug manufacturing operations." (On appeal, appellant does not pursue defense counsel's argument.) The prosecutor responded:

I defy you to find anywhere in here where it talks about a third party in investing. Can't a sole proprietor invest in his own business? Of course he can.

Can't an engineer invest in a computer or slide rule for his business? Of course he can. Can't a lawyer invest in a paper and pen in my trade? Of course he can. Can't a sheriff invest in a badge and a gun of his own? Of course they can. Can't a drug dealer, a drug manufacturer take his money and invest in his business? Of course he can and that is what happened in this case.

We agree with the prosecutor. Thus, we conclude that close examination of section 4.052(a)(2) makes the language of the statute applicable to a person who "bankrolls" his own commission of an offense listed in section 4.052(a)(1). Therefore, we hold that a person violates section 4.052(a)(2) if he spends his own money in the purchase of precursor chemicals and items of property which he then personally uses to manufacture amphetamine in an amount of 200 grams or more. Accordingly, we proceed to dispose of the present case on the basis of that conclusion. If the legislature did not intend this result, we leave it to that body to amend section 4.052.

We conclude that we have direct evidence that appellant knowingly and intentionally purchased with cash precursor chemicals and items of property that could be used to further the commission of an offense listed in section 4.052(a)(1). The controversy, however, centers on whether the evidence is sufficient to show that appellant knew or believed that the cash—the funds—he spent (invested) at Metroplex were intended by appellant to further the commission of an offense listed in section 4.052(1)(a). On appeal, appellant argues that without proof that the precursor chemicals and items of property found in appellant's home were the same as those he previously bought at Metroplex, or that the materials and items of property which he bought were used or intended to be used to manufacture amphetamine, either at his home or some other location, the evidence is insufficient to support the jury's verdict. Appellant insists that "[t]he State's case as to the events charged in the indictment is nothing more than suspicion, innuendo and speculation." Appellant maintains that there is no proof to support a finding beyond a reasonable doubt that the precursor chemicals and items of property found in his home were bought by appellant or that the precursor chemicals and items of property bought by appellant were intended to be used in the manufacture of amphetamine. Appellant supports his contentions by pointing out that there was no evidence that the chemicals and items of property found in his home were the same chemicals and items appellant had been seen buying. Appellant further supports his contentions by reminding us that it is not unlawful to purchase these particular chemicals and items of property and that all of these particular chemicals and items of property are available to the general public. Nevertheless, we disagree with appellant's contentions.

■ For the purposes of this opinion, we assume, but do not decide, that Schmidt's testimony that he "believed" chemicals found in appellant's home came from Metroplex is insufficient to prove identity of property. Nevertheless, we conclude that the jury could reasonably infer that the precursor chemicals and items of property found in appellant's home were the same chemicals and items which appellant had been seen buying. Indeed, it would blink reality to conclude otherwise given the evidence of the extensive amphetamine manufacturing operation conducted at appellant's home. Consequently, we conclude that as a matter of law the circumstantial evidence in the present case supports no inference other than the guilt of appellant. It follows, and we so hold, that in the present case any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, we conclude that the jury could find from the evidence discovered at, and pertaining to, appellant's home, beyond a reasonable doubt, that appellant knew or believed that the cash—the funds—he spent (invested) at Metroplex were intended by appellant to further the manufacture of amphetamine in an amount of 200 grams or more. Thus, we conclude further that the

evidence is sufficient to support the jury's verdict that the appellant invested in the manufacture of amphetamine. We overrule appellant's third ground of error.

## THE SEARCH WARRANT

■ In his first ground of error in both appeals, appellant contends that the trial court erred in admitting into evidence items seized under a search warrant which was based on an affidavit which failed to supply probable cause for the issuance of the warrant. Appellant maintains that because there was insufficient probable cause for the issuance of the warrant, the search of his home violated the Fourth and Fourteenth Amendments of the Constitution of the United States, article I, section 9 of the Constitution of the State of Texas, and article 38.23 of the Texas Code of Criminal Procedure. Appellant, however, failed to urge the statutory ground for suppression of the evidence in the trial court. Thus, appellant has waived this basis of error on appeal. *Nelson v. State*, 607 S.W.2d 554, 555 (Tex.Crim.App.1980). Accordingly, we address only appellant's constitutional arguments under this ground of error.

For the purposes of this opinion, we assume, but do not decide, that when viewed in light of the "totality of the circumstances," there existed no substantial basis from which the magistrate could conclude that sufficient probable cause existed under the Fourth Amendment of the Constitution of the United States and article I, section 9 of the Constitution of the State of Texas to support issuance of the warrant. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Our inquiry, however, does not end. The State, citing *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), maintains that a good faith exception to the exclusionary rule exists when the arresting officer relies in good faith on a warrant which is later held to be invalid. Accordingly, the State

argues that even if the search warrant was issued upon an affidavit lacking in probable cause, suppression of the evidence was not the proper remedy. We agree.[2]

■ In *Leon,* the Court emphasized that its holding in no way altered the probable cause standard, but, instead, dealt solely with the remedy to be applied to a concededly unconstitutional search. *Leon,* 104 S.Ct. at n. 13. The Court concluded that the evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate should be admissible in the prosecution's case-in-chief. *Id.* at 3416. The test is an objective one; whether, considering all the circumstances, a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. *Id.* at n. 23. Among the circumstances in which the good faith exception does *not* apply are those where the issuing magistrate wholly abandoned his judicial role; where a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid; or where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Id.* at 3422.

■ Regarding the first factor, we find no evidence in the record which suggests that the issuing magistrate in any manner abandoned his neutral, judicial role. Likewise, there is no defect apparent on the face of the warrant: it describes both the premises to be searched and the items to be seized with sufficient detail. As to the final factor, we cannot say that the officers executing this warrant were "entirely unreasonable" in their belief that the warrant was supported by probable cause. We reason that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," *Gates*, 103 S.Ct. at

2. We emphasize that in the present case we are not presented with the question of whether the good faith exception to the exclusionary rule is applicable to challenges made under TEX.CODE

CRIM.PROC.ANN. art. 38.23 (Vernon 1977). *See Polk v. State,* 704 S.W.2d 929 (Tex.App.—Dallas 1986, no pet.).

2330, and that, once an officer has obtained the issuance of a warrant from a neutral and detached magistrate, he has taken "every step that could reasonably be expected of [him]." *Massachusetts v. Sheppard,* 104 S.Ct. 3424, 3429 (1984). Furthermore, we note that the officers in the present case obtained reliable information from a fellow officer which could reasonably have led them to suspect that appellant was manufacturing methamphetamine. Additionally, the officers attempted to obtain independent corroboration of this "tip" by conducting a surveillance of appellant's residence. We therefore conclude that the officers in the present case acted in an objectively reasonable manner in relying on the search warrant. Thus, we conclude further that the complained of evidence was admissible in the prosecution's case-in-chief. It follows, and we so hold, that the trial court did not err in denying appellant's motion to suppress. Hence, we conclude that the trial court did not err in admitting evidence seized under the challenged search warrant. We overrule appellant's first ground of error in both appeals.

## SPEEDY TRIAL IN THE COCAINE CASE

In his second ground of error, appellant contends that the trial court erred in denying his motion to set aside the indictment under the Texas Speedy Trial Act, TEX. CODE CRIM.PROC.ANN. art. 32A.02 (Vernon Supp.1986). The Speedy Trial Act provides: "A court shall grant a motion to set aside an indictment, information, or complaint if the state is not ready for trial within ... 120 days of the commencement of a criminal action if the defendant is accused of a felony." Section 1(1). A criminal action against an accused commences, for the purposes of the Speedy Trial Act, when "an indictment, information, or complaint against the defendant is filed in court, unless prior to the filing the defendant is either detained in custody or released on bail or personal bond to answer for the same offense or any other offense arising out of the same transaction, in which event the criminal action commences when he is arrested." Section 2(a).

The record reflects that appellant was arrested on June 29, 1984, and was released on bond that same day. Thus, for purposes of speedy trial, the criminal action against him commenced on June 29, 1984. The indictment was returned on October 25, 1984, 118 days from the date the criminal action commenced. Also on October 25, the State filed its announcement of ready, thereby establishing a prima facie showing of compliance with the Act. *Scott v. State,* 634 S.W.2d 853, 855 (Tex.Crim. App.1982). The burden then shifted to appellant to rebut the prima facie showing of readiness created by the State's announcement. *Id.* Appellant argues that he successfully rebutted the State's prima facie showing that it was ready for trial. At the hearing on the motion to set aside the indictment, the prosecutor who filed the announcement of ready testified that he was not the prosecutor who would try the case. The prosecutor who was eventually assigned to try the case testified that he was unaware of the existence of the case until November 4, 1984, after the expiration of the 120–day period and after the motion to set aside the indictment was filed. Thus, appellant argues that the State was not ready for trial within the 120–day period provided for in the Speedy Trial Act. We disagree.

Appellant would have us hold that only the prosecutor who actually will try the case may file an announcement of ready. We do not read the Act so narrowly. The statute provides that the court shall grant a motion to set aside an indictment if the *State* is not ready for trial within the appropriate time. Had the Legislature intended to provide that only an announcement of ready made by the prosecutor assigned to try the case be effective, it would have been an easy matter to say so. Moreover, we see no policy reason for requiring that a particular prosecutor file the announcement of ready, so long as the *State* is, in fact, ready for trial. The purpose of the Speedy Trial Act is to afford an

individual his right to a prompt adjudication of the charge against him. *Wilson v. State,* 633 S.W.2d 952, 955 (Tex.App.—El Paso 1982, no pet.). If the charge against the accused can be promptly adjudicated and the purpose of the Speedy Trial Act fulfilled, we can discern no reason to require that a particular prosecutor file the announcement of ready. We therefore hold that where a prosecutor under the authority and direction of the District Attorney, and who is presently responsible for the handling of a case, files an announcement of ready, the announcement is effective to establish a prima facie showing of compliance with the requirements of the Speedy Trial Act. To the extent that they may be read as contrary to this holding, we expressly decline to follow *Hoffman v. State,* 687 S.W.2d 495 (Tex.App.—Houston [14th Dist.] 1985, pet. granted) and *McLean v. State,* 638 S.W.2d 124 (Tex.App.—Fort Worth 1982, pet. ref'd).

 The prima facie showing of compliance with the Speedy Trial Act created by the State's announcement of ready can, of course, be rebutted by evidence that the State was not, in fact, ready for trial within the period provided. *Barfield v. State,* 586 S.W.2d 538, 542 (Tex.Crim.App.1979). In the present case, however, the prosecutor who filed the announcement of ready testified that he had discussed the case with one of the narcotics officers involved in the case, that the officer was available to testify, that a lab analysis of the cocaine had been prepared and that he "felt [I was] prepared." This evidence was uncontroverted. Thus, we conclude that appellant failed to rebut the prima facie showing of compliance with the Speedy Trial Act created by the State's announcement of ready. Accordingly, we hold that there was no violation of the Speedy Trial Act and we overrule appellant's second ground of error in the cocaine case. In light of our holding that there was no violation of the Speedy Trial Act, we do not reach the State's contention that the Speedy Trial Act is unconstitutional.

## SPEEDY TRIAL IN THE INVESTING CASE

In his second ground of error, appellant contends that the trial court erred in denying appellant's motion to set aside his indictment in the illegal investment case for violation of the Speedy Trial Act. The record reflects that appellant was indicted in the investing case on May 24, 1985. Appellant was arrested on that charge on May 29, 1985, and, on the same day, the State filed an announcement of ready in that case. Appellant, however, argues that the criminal action against him in the investing case commenced on June 29, 1984, the date on which he was arrested and charged with possession of cocaine and manufacture of amphetamine, because all three actions arose from the same transaction or series of transactions. *See* section 2(a). Thus, appellant insists that because the indictment and announcement of ready in the illegal investment case were not filed within the 120–day period following his arrest on June 29, 1984, the trial court should have dismissed the investing charge. We disagree.

 A criminal transaction is an act, or a series of acts, arising from a single criminal impulse. *Whiteworth v. State,* 624 S.W.2d 767, 769 (Tex.App.—Houston [14th Dist.] 1981, no pet.). When a person is detained, placed under restraint or taken into custody, all chargeable, voluntary conduct in which the person was then and there engaged, constituting an offense continuing in nature, arises out of the same transaction. *Kalish v. State,* 662 S.W.2d 595, 600 (Tex.Crim.App.1983). In the present case, it is clear that appellant was not engaged in investing on June 29, 1984, the date of his first arrest; that act was complete on May 7, 1984, and was in no way continuing on June 29, 1984. Indeed, the record from the hearing on appellant's motion to set aside the indictment reflects that the State did not possess sufficient evidence to prosecute the investing charge until it learned of the existence of the May 7, 1984 videotape of appellant sometime in late April or early May of 1985. Thus, we

conclude that the investing offense and the possession of cocaine offense did not arise from the same transaction or series of transactions. We further conclude that, for purposes of speedy trial, the criminal action against appellant in the investing case commenced on May 24, 1985, the date on which appellant was indicted for that offense. Because the State filed an announcement of ready within the 120–day period provided for by the Speedy Trial Act, the burden shifted to appellant to rebut the prima facie showing of readiness created by the announcement. *Scott v. State*, 634 S.W.2d 853, 855 (Tex.Crim.App. 1982). Appellant presented no evidence to show that the State was not ready for trial within the time provided for in the Speedy Trial Act. Accordingly, we overrule appellant's second ground of error.

We affirm the judgments of the trial court.